# Franks *v.* Point Marion Bridge Company, Appellant.

Argued April 20, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES, and RHODES, JJ.

*Jos. W. Ray, Jr.,* of *Shelby, Ray & Coldren,* with him *Herman M. Buck,* for appellant.

*Lewis M. D'Auria,* with him *Fred L. Brothers,* for appellee.

OPINION BY RHODES, J., July 15, 1937:

This is a workmen's compensation case in which the claimant seeks to recover compensation for the death of her husband who died from a gunshot wound inflicted by a shot from a rifle. The referee found that the discharge from the rifle prematurely was unexpected by the deceased; that the deceased had no intention of taking his own life; that his death was the result of an injury by accident sustained while in the regular course of his employment with the defendant; and made an award to the claimant. Defendant appealed unsuccessfully to the board and the common pleas, and has now appealed to this court.

At the hearing before the referee, defendant admitted that claimant's husband was employed as a "toll collector" on the bridge of defendant at Point Marion, Pa., and that claimant's husband died as a result of a gunshot wound sustained April 10, 1934, while in the employ of the defendant and while at a place where the nature of his employment required him to be.

On April 10, 1934, the day of his death, deceased arose at 7:30. He seemed to be normal and in his usual good spirits. He left home to go to work at 11:45 a. m. and arrived at the toll house at 11:50 a. m.

The inside measurements of the toll house were 10 feet by 3 feet, the longer dimension running parallel with the bridge, which crosses the river in an east and west direction, so that the long sides of the building face respectively north and south. In one end of the toll house was built a shelf which is referred to as a desk. This shelf took up the whole width of the toll house and extended out from the easterly wall about 2 feet and was about 42 inches from the floor and flush with the bottom of the window sill of a window in the

easterly end of the building, the window being about 23 or 24 inches square. There was a similar window at the western end of the toll house. In both the north and south sides of the building there were a window and a door, the latter being 2 feet 8 inches by 6 feet 8 inches, and the edge being 53 inches from the east end of the building. Directly next to the door and separated from it by the width of the jamb were the windows on either side. In the eastern end, extending from the desk to the eastern side of the door entrance was a platform approximately 36 inches square and about 4 or 5 inches above the floor level, so that the platform was between the two windows on the north and south sides of the building, but did not extend across the doorway. The purpose of this platform was to enable the toll keeper to sit between the windows on either side and collect toll as traffic passed. The bottom of the windows on the north and south sides of the building was 38 inches above the top of the platform. In addition to a gas heater in the westerly end, the toll house was equipped with a straight-back chair, the seat of which was 18 inches high, with no sides or arms, and a round top four-legged stool. Money was kept in the drawers of the desk, and on a small shelf under the desk, in a box, was a loaded .38 caliber revolver, which had been placed there by defendant for the protection of the toll keepers and its business. In this connection the toll keepers were instructed "to let them [robbers] have the money and then let them have the gun."

Two witnesses were produced by claimant, who had paid toll to deceased shortly before his death. The first observed him at about 3 p. m., and said that he was in good spirits and that there was nothing peculiar or unusual about him. The second saw him between 3 and 3:30 p. m., and spent about 8 or 10 minutes talking with him. This witness had known deceased since

1922, and had seen him almost every day since that time. Of deceased's appearance on this last occasion, the witness said he was "happy man. Same like anybody else. No worry or nothing. Same like before." When the conversation terminated the witness left the deceased and proceeded to cross the bridge in his automobile in a westerly direction toward Greene County. He had traveled about 80 or 100 feet and reached the middle of the bridge when he heard a shot. He thought nothing of it and paid no further attention to it. He arrived at his home, which is a quarter mile from the Point Marion bridge, at 3:30 or 3:40 p. m., having made no stops after leaving deceased. At about 3:40 p. m. a William Glover arrived at the toll house, driving across the Point Marion bridge in an easterly direction toward Fayette County. When he stopped to pay toll no one appeared to collect it. He "raised up" in his seat and saw the deceased sitting on the straight-back chair with his face resting against the north side of the toll house. The chair was 12 or 14 inches from the wall against which deceased's head was resting, the seat of the chair being 8 or 10 inches from the desk. His left arm was hanging straight down, and the witness did not notice the position of the right arm. The body was slumped, and there was blood on the face of deceased and on the floor. His glasses "were pushed way up high on his forehead." Between his legs, his feet being about 10 inches apart, was a .22 caliber rifle. The stock was on the floor with the barrel pointing upward and leaning against the same wall as that upon which deceased's face was resting. As Glover entered the toll house, he saw a "couple twitches in the neck" of deceased which "looked like a pulse rate." He had observed no one approaching or leaving the bridge as he crossed it.

The straight-back chair, in which the body was seated, and the stock of the rifle were upon the platform pre-

viously described. One of defendant's witnesses testified: "Q. Would you say that the chair was about in the position that the decedent would be seated where—would be seated were he sitting in front of the window waiting for passengers—waiting to collect toll? A. The chair is in that position practically all the time. Q. If a man in an auto were coming from the Fayette side of the bridge, going over to the Greene County side, would the toll be collected at the window at which the decedent was seated? A. Yes. All he would have to do would be to open the window and collect the toll."

Dr. A. D. Hunger was called and arrived at the toll house between 3:30 and 4 p. m. Testifying as a witness for the defendant, his description of the position in which he found the body corresponded generally with that given, adding that the rifle was pointing into deceased's left eye. His examination disclosed a wound in the middle of deceased's forehead "right above the eyebrow." Around the wound "there were small layers of powder marks. They were not spread out. It was just a fine ring. ......Smaller than a dime." There was "a searing right in the wound." He was permitted to express the opinion, but said that he was no expert, that the shot had been fired at close range, meaning that "it was pressed against the part; in close apposition." At the time of his examination Franks was dead. However, the body was warm, and he was of the opinion that life had ceased from 2 to 5 minutes before he had arrived, although from the condition of the body it was possible that the hemorrhage had existed for ten minutes. The funeral director, who was also deputy coroner, and who testified for the defendant, also examined the body. He described the point where the bullet entered deceased's forehead as being about 1/8 inch left of the center line directly in the hairline. The course of the bullet was back and upward for 7 inches, at which point it was about 1 inch higher than the

point where it entered the skull. He also testified that the wound was seared. Over objection of claimant's counsel, he was permitted to testify that the rifle was in close proximity to the forehead when the shot was fired, basing this statement on the smallness of the circular burn. He "couldn't say exactly how close." Also over objection he stated that the wound could not have been inflicted in the manner described if deceased had been sitting upright with the rifle pointed upward. He was present when the state police tested the rifle, and it did not fire when hit on a concrete floor covered with linoleum. There was a two-pound pull on the trigger.

The .22 caliber rifle, 30½ inches in length, was the property of a boy named Ernest Rager, who had loaned it to deceased on the Thursday preceding his death, and on the same day purchased shells for him. Over the objection of claimant's counsel, he was permitted to testify that deceased told him he wanted the gun to shoot blackbirds. It was not disputed that the defendant never furnished the rifle in question, or any like it, to the toll keepers of the bridge company, that the only gun placed in the toll house by the defendant was the .38 caliber revolver, and that defendant had informed deceased of its presence.

It appears that between October 15 and Christmas of the year preceding his death deceased had remained away from his work in order to "rest up." During this time his son Leland worked in his place. Previous to that period and subsequent thereto he had worked steadily, and upon his return, in the words of his superior, "he seemed in better spirits than before he had taken his vacation."

Appellant's argument presents two contentions: (1) That the testimony conclusively shows that deceased's death was not accidental, but intentionally self-in-

flicted; (2) that the act resulting in deceased's death bore no relation to his employment.

The question presented to us is whether the testimony warrants the finding and conclusion that deceased was accidentally killed while in the course of his employment. Section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736 (77 PS § 431), provides "that no compensation shall be made when the injury or death be intentionally self-inflicted, but the burden of proof of such fact shall be upon the employer." The compensation authorities found that deceased's death was accidental and not intentionally self-inflicted; hence we must consider the evidence in the light most favorable to the claimant to whom an award was made.

There was no eyewitness to the accident; therefore, how deceased met his death rests on circumstantial evidence, and the inference as to the manner of deceased's death was for the compensation authorities to draw, under the circumstances of this case, unless it can be said as a matter of law that the award in claimant's favor entirely lacks evidential support, and the evidence conclusively showed a self-inflicted injury or suicide. *Ford v. A. E. Dick Co.*, 288 Pa. 140, 149, 135 A. 903, 907.

Claimant was required to show that the death of her husband was accidental, but not necessarily the precise nature of the accident. *Watkins v. Pittsburgh Coal Co.*, 278 Pa. 463, 123 A. 461. Nonprobability of death by suicide could not take the place of evidence required to be furnished by claimant in order to prove her case. *Walters v. Western & Southern Life Ins. Co.*, 318 Pa. 382, 390, 178 A. 499, 502. On the other hand, the findings of the compensation authorities must be sustained unless it appears that the inevitable conclusion from the facts presented was that the deceased had committed suicide. "Suicide is a question of intention

to be inferred from circumstances where no direct evidence exists": *Slattery v. Great Camp of the Knights of the Maccabees for Pennsylvania (No. 2), 19* Pa. Superior Ct. 111, at page 113. The testimony showed no motive for the deceased to commit suicide, nor does it indicate that the deceased ever planned self-destruction.

We are not convinced that the location of the deceased's body and the rifle can lead to no other conclusion than that the fatal wound in his head was intentionally self-inflicted. The inference of suicide was strong, but the evidence was not so indisputable in weight as to preclude any other conclusion. Firearms are often easily and unaccountably accidentally discharged. Moreover, it was proper for the compensation authorities, in balancing the evidence for and against the conflicting theories of accidental death and suicide, to keep in mind the general probability against suicide—a probability arising from the "usual current of things." *Watkins v. Prudential Life Ins. Co.,* 315 Pa. 497, 173 A. 644. We find no legal basis for interfering with the finding that deceased's death was the result of an injury by accident.

Section 301 of the Workmen's Compensation Act (77 PS § 431) provides that compensation shall in all cases be made by the employer "for personal injury to, or for the death of, such employe, by an accident, in the course of his employment, ...... without regard to negligence." This section (77 PS § 411) excludes from the term " 'injury by an accident in the course of his employment' ...... an injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment." But it provides that it shall include "all other injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer,

whether upon the employer's premises or elsewhere, and shall include all injuries caused by the condition of the premises or by the operation of the employer's business or affairs thereon, sustained by the employe, who, though not so engaged, is injured upon the premises occupied by or under the control of the employer, or upon which the employer's business or affairs are being carried on, the employe's presence thereon being required by the nature of his employment."

The term "injury by an accident in the course of his employment," as used in this section of the Workmen's Compensation Act, "embraces all injuries received while engaged in furthering the business of the employer, and injuries received on the premises, subject to these limitations: (1) the employee's presence must ordinarily be required at the place of injury, or, (2) if not so required, the departure of the servant from the usual place of employment must not amount to an abandonment of employment, or be an act wholly foreign to his usual work; it must be merely an innocent or inconsequential departure from the line or place of duty": *Shoffler v. Lehigh Valley Coal Co.*, 290 Pa. 480, at page 483, 139 A. 192, at page 193. In the Shoffler case, supra, at page 484, it was also held that: " 'Course of employment' does not include (a) injuries received while away from the actual place of employment where the deviation or departure is wholly foreign to his duties, and amounts to an abandonment of employment; (b) injuries received in the commission of an act which is in direct violation of the law; or (c) an act contrary to the positive orders of the employer." In *Dickey v. Pittsburgh & Lake Erie R. R. Co.*, 297 Pa. 172, 146 A. 543, referring to clause (c) in the Shoffler case, supra, the Supreme Court held that injuries resulting from acts which are negligent or constitute wilful misconduct, or are in direct hostility to and in defiance of positive orders of the employer, are com-

pensable if the employee's duties include the doing of the act that caused the injury, or were so connected with the act that as to it he was not in the position of a stranger or trespasser. See, also, *Jenkins v. Glen Alden Coal Co.*, 126 Pa. Superior Ct. 326, 330, 191 A. 227, 229; *Gurski v. Susquehanna Coal Co.*, 262 Pa. 1, 104 A. 801; *Barkanich v. Jeddo-Highland Coal Co.*, 105 Pa. Superior Ct. 145, 160 A. 137; *Waite v. Pittsburgh Limestone Co.*, 78 Pa. Superior Ct. 7.

There is no testimony in the instant case that deceased was fatally injured in the commission of an act which was in direct violation of the law, or in the commission of an act contrary to the positive orders of his employer, nor were his injuries received while away from the actual place of employment. On the contrary, the deceased was on his employer's premises, at the place he was required to be, and, a few moments before the fatal accident, was performing his assigned duties in furtherance of the interests of his employer. The testimony does not disclose how the accident actually happened; nor can it be conclusively inferred that he was doing something wholly foreign to his employment at the time, or that he was killed as the result of his commission of an act wholly foreign thereto. See *Granville v. Scranton Coal Co.*, 76 Pa. Superior Ct. 335, 341. The deceased's duty was to receive tolls. In this he was engaged within a few minutes of the time he was fatally injured; and when found he was in his customary place for receiving tolls. "A man does not cease to be an employee because at certain instants of time he is not actually engaged in work": 71 Corpus Juris § 406, at page 664.

Appellant argues that the rifle which inflicted the fatal wound was not connected with or related to the duties that were assigned to the deceased; that it was borrowed by the deceased, and kept on the premises of his employer solely for his own diversion and amuse-

ment; and that under these circumstances compensation cannot be recovered by claimant for her husband's death. To sustain this position appellant relies on the case of *Beamer v. Stanley Co. of America et al.,* 295 Pa. 545, 145 A. 675. In that case deceased, an assistant manager for a theater company, was killed by an accidental discharge of an automatic revolver while exhibiting it to some fellow employees. His duties did not require him to have a revolver about him, and its presence was held to be wholly foreign to his employment. He was not the custodian of any money or other valuable thing which he was called on to protect, and his employer did not know that he had the revolver, although the accident occurred on the premises during working hours and in the lobby of the theater where deceased's regular employment required him to be. It was held, at page 547: "The weapon was carried without defendant's authority, and against its wishes. Deceased met death accidentally while on the premises, but as the result of a commission of an act which bore no relation to his employment." That case is distinguishable from the case at bar. In the latter the deceased was permitted to have firearms, and he was the custodian of his employer's money. A revolver was on the premises in the custody of the deceased with the knowledge and consent of the appellant. Had the deceased been accidentally killed when on the premises of the appellant and in the performance of his duties while handling the revolver, his death would have been compensable. In other words, if the deceased had been accidentally killed by the revolver, instead of the rifle, there would be no question about claimant's right to compensation. *Berlin v. Crawford,* 86 Pa. Superior Ct. 283; *Hess v. Union Indemnity Co.,* 100 Pa. Superior Ct. 108. The presence of the additional firearm was not prohibited by the appellant, or in direct violation of its positive orders, and the accidental death of deceased

therefrom, while on the premises of the appellant in the performance of his assigned duties, cannot under the circumstances of this case be held, as a matter of law, to be the result of the commission of an act outside the course of his employment. It is not a requirement in this state that the accident arise out of the employment. *Hale v. Savage Fire Brick Co.,* 75 Pa. Superior Ct. 454; *Granville v. Scranton Coal Co.,* supra. In somewhat analogous cases, in other jurisdictions, compensation has been denied mainly for the reason that the accident did not arise out of the employment. See *Bull et al. v. Wayco Oil Corp. et al.,* 250 Mich. 51, 229 N. W. 597; *De Salvo v. Jenkins et al.,* 205 App. Div. 198, 199 N. Y. S. 843, affirmed 239 N. Y. 531, 147 N. E. 182; *Hendrix et al. v. Franklin State Bank et al.,* 154 Tenn. 287, 290 S. W. 30; *Hicken v. Ebert-Hicken Co. et al.,* 191 Minn. 439, 254 N. W. 615. In *Holland v. Continental Cas. Co.* (La. Court of App.) 155 So. 63, and *Gallagher v. United States Fidelity & Guaranty Co.* (Tex. Civ. App.) 77 S. W. (2d) 312, compensation was allowed. In the latter case claimant was employed to look after the oil wells on his employer's leases and to protect employer's property. He had in his possession a shotgun which he contended he used in protecting employer's property, as well as his own, and which he also used for shooting predatory animals and birds. While getting rags from his automobile for the purpose of cleaning one of the oil tanks, the gun which was in the car slipped out of the door, falling on the running board, and was accidentally discharged, resulting in injuries for which compensation was asked. Claimant was injured on Monday, and had placed the gun in his automobile the previous Saturday afternoon when he went to inspect one of the oil wells on his employer's leases. The defendant contended that where the employee's injury was brought about solely by a dangerous instrumentality injected into the employment by the

employee himself, not provided for in the contract of employment and which could not be said to have been reasonably anticipated by the employer, or not reasonably necessary to the carrying out of the employment, it was not compensable under the Workmen's Compensation Law of Texas.[1] It was held that, although claimant frequently used the gun in shooting rabbits and birds as a pastime while driving from one lease to another and while not actually engaged and at work, his right to recover was not affected because he was injured on one of the leases while actually performing his prescribed duties.

Deceased may have been guilty of contributory negligence, but that is no bar to compensation. *Dzikowska v. Superior Steel Co. et al.*, 259 Pa. 578, 583, 103 A. 351, 352; *Callihan v. Montgomery*, 272 Pa. 56, 63, 115 A. 889, 891.

Deceased's accidental death occurred during his hours of employment, on the employer's premises, at the place where the deceased was assigned for the performance of his duties, and the circumstances showed that there was no break in the continuity of his employment. See *Flucker v. Carnegie Steel Co.*, 263 Pa. 113, 106 A. 192; *Tomlinson v. Clarion River Power Co. et al.*, 96 Pa. Superior Ct. 318; *Moody v. Susquehanna Collieries Co.*, 107 Pa. Superior Ct. 134, 163 A. 332.

The compensation authorities were justified in find-

[1] The Workmen's Compensation Law of Texas (Vernon's Texas Civil Statutes, Centennial Edition 1936, title 130, art. 8309, § 1, 2d subdiv. 4) provides: "The term 'injury sustained in the course of employment,' as used in this law, shall not include:...... 4. An injury caused by the employee's willful intention and attempt to injure himself, or to unlawfully injure some other person, but shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

ing that the injury was not intentionally self-inflicted: and we find no bar to claimant's recovery. The findings of fact supported by competent evidence warrant the conclusion that the deceased was accidentally killed in the course of his employment.

Judgment is affirmed.