32 So.2d 666

**SOUTHERN COTTON OIL CO. v. BRUCE.**

8 Div. 388.

Supreme Court of Alabama.

Nov. 6, 1947.

Rehearing Denied Dec. 4, 1947.

A. H. Carmichael, of Tuscumbia, and Peach, Caddell & Shanks, of Decatur, for appellant.

McDonnell & Jones, of Sheffield, for appellee.

LAWSON, Justice.

Certiorari was granted on petition of the Southern Cotton Oil Company, a corporation, to review a decree of the circuit court of Colbert County awarding compensation to the widow and minor children of Ben Bruce, deceased, for the death of their husband and father, who at the time of his death was an employee of the said company.

The proceedings were instituted in the trial court under the Alabama Workmen's Compensation Law, Chapter 5, Title 26, Code of 1940 by Mrs. Lue Bruce, the widow, who sued on her own behalf and that of the minor children.

The trial judge made a full statement of the facts, his conclusions thereon, and his views of the law applicable thereto. Petitioner does not challenge the material facts as found by the trial judge. The finding of facts is as follows:

"Ben F. Bruce, deceased, was employed at the time of his death in August, 1943, and since the year 1926 as a night watchman by the defendant company, Southern Cotton Oil Company, a Corporation. The Company was doing business in Sheffield, Alabama, employing more than sixteen employees and was subject to and governed by the provisions of the Workmen's Compensation Law of Alabama as was the said Bruce.

"Bruce's average weekly earnings were $37.10. The plaintiff, Mrs. Lue Bruce, was his wife. Surviving in addition to his widow were two minor children, all three being totally dependent on Bruce for maintenance and support.

"The defendant Company operated a Cotton Oil Mill, being engaged in the processing of cotton seed for the purpose of obtaining cotton seed oil therefrom. The Plant consisted of about three acres of land on which there were ten buildings, among them being an office building. Bruce's duties as night watchman included watching and guarding the whole of the plant against thievery, fire, depredation and other destructive forces. He carried a key to all buildings including the office building. His work hours were from 6:00 P. M. to 6:00 A. M. His immediate superior was J. B. Thompson who had a son, a very young boy, known affectionately by Bruce and most all the officials and employees as 'Sonny.' Sonny frequently visited the Plant with the knowledge of the officials. Bruce, the deceased, and Sonny were particularly good friends and pals. It was common knowledge of the officials that Sonny often made the rounds of the buildings with Mr. Bruce and played in the Company yard.

"On August 18, 1943, when Sonny's mother came for her husband between 6:00 and 6:30 P. M. she brought Sonny in her car and left him at the Plant. As Bruce was completing his first round of checking the other buildings Sonny and Mr. Bruce were seen together walking toward the office building. Sonny had a toy pistol. Mr. Bruce had before made inquiries as to where he could obtain leather with which to make Sonny a holster for the toy pistol. Mr. Bruce had been and was interested in making a holster for Sonny and this was known by Bruce's immediate superior. As the two approached the office building, Mr. Bruce said to Sonny: 'I'll give you a holster.'

"Mr. Bruce carried his own pistol, a 45-calibre one, on his person in his work. In the office in the desk drawer of the Company Cashier was a Company owned 32-calibre pistol which was in a holster loaned to the Company by Mr. Bruce. Bruce had at times, though infrequently, used both pistols in his work. He used the Company pistol with the knowledge and acquiescence of the Company officials with which to shoot rats in the Company buildings or on the Company property. The Company-owned 32-pistol—'the pistol with which Mr. Bruce was shot—was kept on the premises by the Company to be used by any of the employees of the defendant Company who had not been equipped with a pistol for protecting the employees and the property of the defendant Company, and it was not entrusted by the Company to any definite employee but was kept in the desk which was used by H. E. Jeffry, Jr., Cashier, where it was located on the day Mr. Bruce was shot.' (Quotation from defendant's answers to Interrogatories.)

"Mr. Bruce and Sonny came into the office from the back door. Sonny laid his toy pistol on Mr. Jeffry's desk. Mr. Bruce opened the desk drawer, secured the Company pistol, removed it from his holster, laid the Company pistol down on the desk and picked up Sonny's toy pistol. Sonny mean while playing around the office returned to the desk, picked up the pistol which was at that moment lying thereon, that is, the Company owned 32 pistol, and pulled the trigger, shooting Mr. Bruce. Bruce died therefrom shortly.

"The shot was heard about four or five minutes after Bruce and Sonny, in very

close proximity to the office building, were seen walking toward that building. The office with Company knowledge and acquiescence served as Bruce's headquarters or 'hangout.' He kept his coat and hat and his personal belongings there. He answered the 'phone for the Company there when other employees had gone from work or were not there. Sometimes he ate there. There was ice water in the office for himself and other employees. At times he used the office for weighing in and making record of cotton seed brought to the Company after regular hours in its regular trade when the regular workmen employed for that purpose had left the Company's premises for the day. At the time of the shooting, however, there was no cotton seed there to be weighed and checked in or out. All other employees had left the premises, the day's work being over, —there were no witnesses to the shooting.

"Bruce often went to the office between his hourly rounds of checking the other buildings. The Superintendent's office, a toilet and storeroom were in the same office building."

Based on such findings the trial court concluded "that the accident causing Bruce's death arose out of his employment and in the course of his employment and that the defendant is liable for compensation therefor.".

■ This court long ago announced the rule governing our review of cases arising under the Workmen's Compensation Act. We have uniformly held that if there is any reasonable view of the evidence that will support the conclusion reached by the trial court, the finding and judgment will not be disturbed. Ex parte Sloss-Sheffield Steel & Iron Co., 207 Ala. 219, 92 So. 458. For later cases see Houser v. Young, 247 Ala. 562, 25 So.2d 421; Malbis Bakery Co., Inc., v. Collins, 245 Ala. 84, 15 So.2d 705.

Petitioner, defendant below, in its answer admitted that at the time Bruce was killed he was an employee of that company and that both parties are subject to the Workmen's Compensation Law.

As before indicated, petitioner does not seriously question the trial court's statement of the facts. Petitioner does insist, however, that the facts as found by the trial court do not warrant the conclusion reached that Bruce met his death as a result of an accident which arose out of and in the course of his employment.

Therefore, the precise legal question presented to this court is whether the evidence as stated by the trial court, or the reasonable inferences therefrom, tend to support the conclusion of the trial court that the deceased was killed in an accident which arose out of and in the course of his employment.

■ That the deceased employee met his death as a result of an accident is not controverted. We think it clear that his death was accidental within the meaning of the statute. Boris Const. Co. v. Haywood, 214 Ala. 162, 106 So. 799; Ex parte Rosengrant, 213 Ala. 202, 104 So. 409; Dean v. Stockham Pipe & Fittings Co., 220 Ala. 25, 123 So. 225; McLaughlin v. Davis Lumber Co., 220 Ala. 440, 125 So. 608.

■ But in order for compensation to be awarded the accident which caused his death must have arisen out of and in the course of his employment.

■ The phrase "arises out of" employment refers to employment as the cause and source of the accident. Garrett v. Gadsden Cooperage Co., 209 Ala. 223, 96 So. 188. "We have written into our law the words of the Madden's Case, 222 Mass. 487, 111 N.E. 379, L.R.A.1916D, 1000, to wit: 'The rational mind must be able to trace the resultant injury to a proximate cause set in motion by the employment, and not by some other agency.' Also the following (Garrett v. Gadsden Cooperage Co. [supra]): 'In Hinchuk v. Swift & Co., 149 Minn. 1, 182 N. W. 622, it is said that the principle applicable to cases like that at bar is that the injury is included within the statute if there is some causal relation between the employment and the injury; the court adding: "Not that the injury must be one which ought to have been foreseen, but it must be one which, after the event, may be seen to have had its origin in the nature of the employment."'" Dean v. Stockham Pipe & Fittings Co., supra [220 Ala. 25, 123 So. 227].

We have in this jurisdiction two decisions by this court where compensation was held

to have been correctly awarded where employees met their death as a result of accidental shootings. In both of them it was held that the evidence was clear to the effect that the deceased received the injury which caused his death in the course of his employment. It appears that the question for decision in both cases was whether the accident arose out of the employment.

In Ex parte Rosengrant, 213 Ala. 202, 104 So. 409, 412, the duties of the deceased employee were to grade and tally lumber as it was removed from barges on the Mobile River into the planing mill of the employer, which mill was situated on the river bank. He was killed while engaged in such work. As to whether the accident occurred in the course of the employment this court said: "It is clear from the evidence, and the court properly found, that he received the injury which caused his death in the course of his employment." We also found that the accident arose out of his employment "within the spirit, purpose, and meaning of this Workmen's Compensation Act." In this connection it was said: "His duties under his contract called him to this place, where tug boats loaded with lumber were waiting, and where schooners, tugs, and barges with crews were coming and going. This exposed him to hazards from loafing and working crews on these boats, to which he would not otherwise have been subjected. The Mobile river is a navigable stream, a public place in its nature for boats. It placed him in contact with the different crews of the different tug boats and schooners on this river at this place. It is evident from the evidence the decedent would not have been at that locality at the time the pistol was fired, accidentally, but for his employment by the defendant. His employment by the defendant contributed proximately in causing his injury. By reason of his employment he was exposed to this hazard, which was a natural incident of his work at that place and which he would not probably have otherwise encountered. It is reasonably apparent from the entire evidence that the decedent would not have received this injury but for this contract of employment of him by defendant."

It appears in Boris Const. Co. v. Haywood, 214 Ala. 162, 106 So. 799, that the deceased was a truck driver for the construction company and was killed while standing near a truck he was employed to drive, and while the truck was standing in front of the defendant's place of business within the city limits of Birmingham. The deceased was in the act of stepping up into the truck for the purpose of driving it to deliver certain goods or articles for the defendant, when a small boy something like a block away, and off the premises of the defendant, fired a 22 rifle at a sparrow, and the bullet struck said employee in the back of the head and killed him instantly. As to whether the accident occurred in the course of the employment, Mr. Chief Justice Anderson, in writing for the court, said: "The deceased was unquestionably acting in the course of his employment, and while in the act of discharging his duty thereunder, and came to his death by virtue of an accident as the boy was shooting at a sparrow and did not intend to shoot him." Having determined that the accident occurred in the course of the employment, it was held that compensation was correctly awarded, because, "As often held by this and other courts, the Workmen's Compensation Act was intended to serve a beneficent purpose, and should be liberally construed so as to effectuate its humane design. We think the finding of the trial court was fully justified under the recent case of Ex parte Rosengrant, 213 Ala. 202, 104 So. 409, which is identical in principle with the present case, and, though not identical in facts, they are substantially similar. It matters not that the risk from the accident in question may have been external to the employment; yet the employment caused the exposure to the risk."

As before indicated, we held in the two cases last above referred to that the conditions under which the employees were accidentally shot were such as to justify a finding that the accidents "arose out of [the] employment," even though the injured employees were not required to handle or carry firearms. In one the employment exposed the employee to hazards of the waterfront and in the other to the dangers of the street. The risk of being accidentally shot was external to their employment.

In Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 8 So.2d 519, we held that compensation

was incorrectly awarded when the employee was accidentally shot while on the premises òf the employer by a woman who intended to shoot another employee. The conclusion in that case does not militate against the holding in the Rosengrant and Boris Construction Company cases, supra. We refused in effect to extend the "street accident" rule to an injury suffered on the premises of the employer. To like effect are the following cases from other jurisdictions: Whitley v. North Carolina State Highway, 201 N.C. 539, 160 S.E. 827; Associated Indemnity Corporation v. Industrial Accident Commission et al., 43 Cal. App.2d 292, 110 P.2d 676; Auman v. Breckenridge Telephone Co. et al., 188 Minn. 256, 246 N.W. 889; Lebeda v. Pongracz et al., 230 App.Div. 606, 246 N.Y.S. 293.

In the instant case the employee's death was caused by the accidental discharge of a pistol which he used with the knowledge and consent of the company officials in connection with the performance of his duties. When guns are handled shooting accidents may be expected. Such an accident is unquestionably a hazard peculiar to the employment of a watchman or other person whose duties require the use of firearms. The duties of his employment subjected him to this hazard to which he would not have been equally exposed apart from the employment. It is such a hazard as can be said to be a natural consequence of the employment. A firearm is a dangerous instrumentality (American Ry. Express Co.· v. Tait, 211 Ala. 348, 100 So. 328) and as to others a person handling or carrying firearms must exercise a high degree of care. Loreno v. Ross, 222 Ala. 567, 133 So. 251.

It was by reason of his employment that the deceased was exposed to the danger incident to the handling and carrying of the pistols, and the hazard of being shot by the accidental discharge of the pistols was unquestionably a natural incident to his work.

█ We hold, therefore, that if at the time the deceased was shot he was acting in the course of his employment, the accident arose out of his employment.

█ We come, therefore, to the questions, Do the facts as found by the trial court show that the accident occurred "in the course of" the deceased's employment? The phrase "in the course of his employment" refers to the time, place, and circumstances under which the accident took place. An injury to an employee arises in the course of his employment when it occurs within the period of his employment, at· a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incident to it. Mobile Liners, Inc., v. McConnell, 220 Ala. 562, 126 So. 626.

The accident definitely occurred within the period of the deceased's employment. It also happened at a place where he had a right to be at the time the accident occurred. The evidence fully supports the finding of the trial court that the place where the shooting took place was used by Bruce, with the knowledge and consent of petitioner, as his headquarters, between his rounds of inspection and that he was just finishing his first round and in returning to the office where the accident happened, he followed a procedure long known to and acquiesced in by the officials of the company. While the evidence shows that the deceased intended to present his young friend with the holster which belonged to deceased when he arrived at the "office," it is not susceptible of the construction that that was the only reason which motivated him in·returning to the office just immediately prior to the time he was shot.

The question remains, Was the deceased employee at the time he was shot reasonably fulfilling the duties of his employment or engaged in doing something incidental to it? Petitioner insists that he was not and contends that the evidence as found by the trial court does not support such a conclusion but on the contrary shows that the deceased at the time of the shooting had departed from the service of the company.

A departure cannot be predicated on the fact that the deceased was in the "office" when he was killed. Although a watchman, he was not required or expected to constantly patrol the grounds and buildings of the company. He continued in his duties as watchman while he was in the "office" which the officials of the company knew he used between rounds of inspection.

Did he perform any act while in the office which constituted a departure from his duties as watchman which proximately caused his death? He handled the company pistol. It was this act which eventually resulted in his death. But he had a right to handle the pistol in connection with the performance of his duties and such right was not dependent upon the necessity of immediately using it against intruders. Petitioner insists, however, that he did not handle the pistol for the company's benefit but for the sole purpose of obtaining his holster to give to his young friend. The trial court did not find such to be the sole reason why deceased handled the pistol. But if we assume that such was the purpose, we do not think that the deceased had departed from his duties as night watchman to such an extent as to deprive his widow and children of the benefits of the Workmen's Compensation Law. The holster belonged to deceased. He had used it in connection with his duties as night watchman. It encased the company pistol used by deceased and officials of the company alike. When the deceased employee placed the pistol in the holster it could not be said reasonably that he was not doing an act incidental to his employment. He had a right to retrieve the holster and in doing so such act was also incidental to his employment. The fact that he wished to present the holster to the little boy rather than to keep it or return it to his house is of no importance.

The question here dealt with is a difficult one, but when the underlying philosophy as to the purpose and scope of the Workmen's Compensation Law is considered, we think the answer is that at the time the deceased was shot he was engaged in the performance of an act incidental to his employment. We hold, therefore, that the accident occurred in the course of the deceased's employment within the meaning of the statute as construed by this court.

There is no formula which can be applied to cases of this kind. Each case must be determined on its own facts and circumstances and other cases are helpful only to the extent that the facts there dealt with are similar to those of the case under consideration. We find no case from this jurisdiction which arose under the Workmen's Compensation Law where the facts even remotely resemble those of the instant case. However, there are several cases from other jurisdictions where under facts somewhat analogous to those here presented compensation was allowed.

In the case of Johnson v. Industrial Commission, 222 Wis. 19, 267 N.W. 286, 287, the claimant was a game warden who was injured while in the employ of the conservation department of the state of Wisconsin. The Industrial Commission of that state found as matters of fact: "That the day of the injury was the opening day of the grouse hunting season of 1933; that applicant, on said day, accompanied one of the state's regular conservation wardens into the woods where grouse might be expected to be found; that a concurrent cause for the trip was the enforcement of the game laws; that another cause was to hunt grouse for their own benefit; that to so hunt grouse was not forbidden by the department; that the two wardens mutually agreed to take shotguns on their trip for the latter purpose; that both participated in hunting, though applicant had not yet fired at a grouse; that while so participating, the applicant was accidentally struck by shots from the other warden's gun while the latter was firing at a grouse; that the injury resulted therefrom." The Industrial Commission denied liability on the part of the state and ordered the claim dismissed. The circuit court decided, upon the findings made by the Commission and the undisputed facts in the record, that the injury did arise out of and was incidental to the employment. It reversed the order of the Industrial Commission. On appeal to the Supreme Court of Wisconsin, that court affirmed the judgment of the circuit court, saying: "As to whether the respondent was injured while performing services growing out of and incidental to his employment, it appears that the accident occurred while respondent was employed as a game warden, and in the company of 'one of the state's regular conservation wardens.' He was in the woods for the enforcement of game laws. If the respondent's injuries resulted from a natural and usual incident of his work, that is, if it was not caused by his own act after assuming a status different

from that of game warden, he is entitled to compensation as found by the court below. The findings of the commission do not exclude the idea of performance of duty on respondent's part at the time of the injury, and they do compel the conclusion that respondent was in the woods in the regular course of his employment. The fact that he was equipped to, and intended for his own benefit to, shoot grouse if an opportunity therefor presented itself, did not take him out of the field of his employment. It appears that in the hunting season it was customary for game wardens, in fact, they were expected by their superior officers, to appear in the woods in the guise of hunters to insure more efficient service on their part. Under the findings and the undisputed evidence, there was no departure from the scope of his employment. Barragar v. Industrial Commission, 205 Wis. 550, 238 N. W. 368, 78 A.L.R. 679. He was where his duties required him to be, and while there, sustained the injuries complained of. Each of the men, the respondent and his companion, were in the woods for the purpose, primarily, of enforcing the game laws and to discover violators thereof. Respondent had not stepped aside for the purpose of shooting grouse for himself. His companion, for the time being, may have become a hunter, and while in a personal capacity, injured the game warden. However, at the time of injury, the game warden was pursuing his official calling. We are not confronted with a situation where respondent, by his mental attitude, transformed himself from a public official into a private individual engaged in hunting. Had he done anything for himself that did not pertain to his official work, it might then be determined that he had engaged in purposes foreign to his employment. The fact that the two wardens carried shotguns on their official trip does not, under the record here, show that the respondent was not on duty, and does not show that, at the time, he was engaged in a personal affair. The service of his employer was the cause of his being in the woods. His private and personal interests in securing game did not take him there. Under the tests suggested in the cases of Barragar v. Industrial Commission, supra, and Marks' Dependents v. Gray, 251

N.Y. 90, 167 N.E. 181, it clearly appears that respondent's ordinary duties as a game warden brought about the expedition, resulted in the exposure and the resulting injury."

In Goins v. Shreveport Yellow Cabs La. App., 200 So. 481, 482, the Court of Appeals of Louisiana, Second Circuit, held compensation properly awarded. That court adopted as its own opinion the opinion prepared by the trial court, having found it to be correct both as to findings of fact and conclusions of law. We quote therefrom as follows:

"The plaintiff, Levi T. Goins, brings this suit for compensation for an injury alleged to have been received as the result of the accidental discharge of a pistol in the hands of another employee, which injury is alleged to have been received in the course of plaintiff's employment, and arising out of such employment.

"The material facts in this case are not in dispute. Defendant operates a taxicab business in the city of Shreveport. The plaintiff was employed as one of defendant's drivers at the time the injury was sustained. On September 25, 1939, the plaintiff was stationed on the Travis Street side of the Washington-Youree Hotel. About 8 P. M. o'clock, R. C. Mills, the driver of a cab parked just in front of that of the plaintiff, left with another employee to get coffee at a nearby restaurant. Goins entered the cab operated by Mills for the purpose of being nearer the telephone in the event a call was received.

"After the return of Mills the two men began to examine a pistol kept by Mills in his cab. Goins returned to his cab and secured the pistol furnished him by the defendant company in order to compare the revolvers. While Goins was sitting in the rear of the Mills cab, the pistol being handled by Mills was accidentally discharged. The bullet passed through Goins' face, resulting in the loss of six teeth, described as the right maxillary cuspid, first and second bicuspids, left maxillary second bicuspid, first molar and right mandibular bicuspid.

"At the time of this accident the defendant was having a labor dispute with some of

the drivers, who were on strike. On several occasions prior to the labor trouble, cab drivers had been robbed, kidnapped and their cabs stolen. As a result of these troubles, the defendant supplied pistols to the drivers. The drivers were not compelled to carry the revolvers, but the evidence leaves us satisfied that they were encouraged to have these weapons for defense of themselves as well as the property of the defendant company.

"The first question to be decided is whether this injury arose out of and in the course of the plaintiff's employment. We have concluded that under the jurisprudence of this State that it did and therefore plaintiff is entitled to compensation.

\* \* \* \* \* \*

"Ordinarily, plaintiff's employment as a cab driver might not expose him to the danger of accidental shooting any more than had he not been so employed, but where the employer furnishes his employee with a revolver for the two-fold purpose of protecting himself and the property of the employer from robbers, kidnappers and possible trouble from striking cab drivers, he is exposed to the danger of accidental shooting. Necessarily, the employee would be called on to handle the pistol other than the occasion when actual danger was presented. As the Court said in the Brown case, supra, we would be indulging in hairsplitting distinctions which would be without foundation in law or fact, should we hold under the facts of this case that the injury did not arise out of and in the course of plaintiff's employment."

In Franks v. Point Marion Bridge Co., 128 Pa.Super. 269, 193 A. 421, 423, two questions were presented to the Superior Court of Pennsylvania: first, whether the deceased intentionally killed himself or was accidentally killed; second, if accidentally killed whether the accident occurred in the course of his employment. Under the Pennsylvania statute it is not necessary that the accident arise out of the employment. That court held that the findings below as to deceased's death being accidental could not be disturbed under the evidence and also that the accident was in the course of the deceased's employment. At the time of his death the deceased was a "toll collector" on the bridge of the defendant company at Point Marion, Pennsylvania. He died as the result of a rifle wound sustained while in the toll house, where he was required to perform his duties. It appears that he was shot about 3:30 p. m. on the afternoon of April 10, 1934. The deceased employee was discovered by a traveler who had stopped to pay his toll. The deceased was sitting in a chair and between his legs was a 22-calibre rifle which was pointing into his left eye. There was a wound in the middle of his forehead. The 22-calibre rifle was the property of a boy who had loaned it to the deceased several days preceding his death. The owner of the rifle also purchased shells for the deceased. The rifle was loaned to deceased for the purpose of shooting blackbirds. The defendant company did not furnish the rifle in question or any like it to the toll keepers. However, they did furnish a 38-calibre revolver, which was kept loaded in a box in the toll house and which had been placed there by the defendant company for the protection of the toll keepers and its business. In this connection the toll keepers were instructed "to let them [robbers] have the money and then let them have the gun." In holding that the accident arose out of the deceased's employment the Superior Court of Pennsylvania said:

"There is no testimony in the instant case that deceased was fatally injured in the commission of an act which was in direct violation of the law, or in the commission of an act contrary to the positive orders of his employer, nor were his injuries received while away from the actual place of employment. On the contrary, the deceased was on his employer's premises, at the place he was required to be and, a few moments before the fatal accident, was performing his assigned duties in furtherance of the interests of his employer. The testimony does not disclose how the accident actually happened; nor can it be conclusively inferred that he was doing something wholly foreign to his employment at the time, or that he was killed as the result of his commission of an act wholly foreign thereto. See Granville v. Scranton Coal Co., 76 Pa.Super. 335, 341. The deceased's duty was to receive tolls. In this he was engaged within a few

minutes of the time he was fatally injured; and when found he was in his customary place for receiving tolls. 'A man does not cease to be an employee because at certain instants of time he is not actually engaged in work.' 71 Corpus Juris, § 406, at page 664.

"Appellant argues that the rifle which inflicted the fatal wound was not connected with or related to the duties that were assigned to the deceased; that it was borrowed by the deceased, and kept on the premises of his employer solely for his own diversion and amusement; and that under these circumstances compensation cannot be recovered by claimant for her husband's death. To sustain this position appellant relies on the case of Beamer v. Stanley Co. of America et al., 295 Pa. 545, 145 A. 675. In that case deceased, an assistant manager for a theater company, was killed by an accidental discharge of an automatic revolver while exhibiting it to some fellow employees. His duties did not require him to have a revolver about him, and its presence was held to be wholly foreign to his employment. He was not the custodian of any money or other valuable thing which he was called on to protect, and his employer did not know that he had the revolver, although the accident occurred on the premises during working hours and in the lobby of the theater where deceased's regular employment required him to be. It was held, 295 Pa. 545, at page 547, 145 A. 675, 676: 'The weapon was carried without defendant's authority, and against its wishes. Deceased met death accidentally while on the premises, but as the result of a commission of an act which bore no relation to his employment.' That case is distinguishable from the case at bar. In the latter the deceased was permitted to have firearms, and he was the custodian of his employer's money. A revolver was on the premises in the custody of the deceased with the knowledge and consent of the appellant. Had the deceased been accidentally killed when on the premises of the appellant and in the performance of his duties while handling the revolver, his death would have been compensable. In other words, if the deceased had been accidentally killed by the revolver, instead of the rifle, there would be no question about claimant's right to compensation. Berlin v. Crawford, 86 Pa.Super. 283; Hess v. Union Indemnity Co., 100 Pa.Super. 108. The presence of the additional firearm was not prohibited by the appellant, or in direct violation of its positive orders, and the accidental death of deceased therefrom, while on the premises of the appellant in the performance of his assigned duties, cannot under the circumstances of this case be held, as a matter of law, to be the result of the commission of an act outside the course of his employment."

For other cases where compensation was allowed as a result of accidental shooting under similar though not identical facts to the case at hand, see Comstock et al. v. Bivens et al., 78 Colo. 107, 239 P. 869; McDaniel v. City of Benson et al., 167 Minn. 407, 209 N.W. 26; Gallaher v. United States Fidelity & Guaranty Co., Tex.Civ.App., 77 S.W.2d 312; Security State Bank of Sterling et al. v. Propst et al., 99 Colo. 67, 59 P. 2d 798; Hess v. Union Indemnity Co., 100 Pa.Super. 108; Berlin v. Crawford, 86 Pa. Super. 283; Arnested et al. v. McNicholas et al., 223 Mich. 488, 194 N.W. 514.

█ It is not every deviation of temporary detachment from duty that will defeat an award. See Horovitz on Workmen's Compensation, page 167.

In the case of Miles v. Gibbs & Hill, Inc., et al., 250 N.Y. 590, 166 N.E. 335, compensation was held to have been correctly awarded where the employee, while walking along a railroad track in the regular course of his employment, struck with a hammer which he was carrying a torpedo on the track, which exploded, causing a piece of metal to enter his left eye, from which he sustained injuries resulting in its removal.

In Franck v. Allen et al., 270 App.Div. 960, 61 N.Y.S.2d 728, an award was held to have been properly made in a case where the injured employee was a farmhand. While sweeping up the floor of the cow barn he noticed an oblong, shell-like object on the floor of the barn, which he picked up. It proved to be a dynamite cap. He attempted to remove the powder by knocking the shell but did not succeed. He then picked up a

nail from a window sill, inserted it in the cap, with the result that the powder exploded, resulting in injuries to the employee.

In Derby v. International Salt Co., Inc., 233 App.Div. 15, 251 N.Y.S. 531, it was held that compensation was properly awarded. We quote from that case as follows:

"The claimant was engaged in moving salt in a hand cart. He placed the cart in position where it would be filled from a chute and while waiting for this he exercised by walking about, as the weather was cold. He received serious injuries to each hand from the explosion of a dynamite cartridge or cap. He describes the happening: 'I saw something across a long board that was laying there. It was shining. It was in a little box and I picked it up and looked at it and in the left hand I held it and * * * I pulled that wire and it exploded.'

"The claimant had not abandoned his employment. It was his duty to wait until the cart was filled, and observing the interesting looking box or device he picked it up to investigate. Except for the dangerous character of his find, this act would not have lessened the amount of labor which he would do. It was a peril arising because of his employment at the salt works."

The deceased having been killed as the result of an accident which arose out of and in the course of his employment, the trial court correctly awarded compensation to his widow and minor children. The decree is affirmed.

Affirmed.

BROWN, LIVINGSTON, SIMPSON and STAKELY, JJ., concur.

GARDNER, C. J., and FOSTER, J., dissent.

GARDNER, Chief Justice (dissenting).

I regret my inability to agree. Guided by emotions, I would readily concur for it is quite manifest from the undisputed proof the watchman Bruce met his tragic end because of his love for the boy and his desire to please him. No stronger case for sympathetic appeal could well be presented.

I am in full accord with the consistent holdings of this court to the effect that the workmen's compensation statute should be liberally construed so as to effectuate its beneficent purpose. But we have often had reason to observe (Cohan Bullard v. Cullman Heading Co., 220 Ala. 143, 124 So. 200; Morgan v. City of Guntersville, 239 Ala. 669, 196 So. 877) that notwithstanding the liberal rule of construction the courts are not authorized to place an injured employee within the influence of the statute who fails to bring himself within the express requirement of the law.

The case is very fully and clearly stated in the opinion of Mr. Justice Lawson and needs no elaboration here. To my mind it is simply an application of the settled rules to the facts of the case, as disclosed by this record.

Of course, the testimony must be viewed from the standpoint of reason because, as we have stated in our decisions, if there is a reasonable view of the evidence that will support the conclusion announced by the trial court the finding and judgment will not be disturbed. Mobile Liners, Inc., v. McConnell, 220 Ala. 562, 126 So. 626. So viewed, therefore, only one conclusion, as I view it, can be reached as to the facts, that is, that Bruce in order to please the boy, of whom he had evidently become very fond, took from the drawer his employer's pistol and laid it on a nearby desk for one purpose only, and that was to secure his holster for the use of this boy and to place in it the boy's toy pistol. As applicable here, we have approved the following rule: the rational mind must be able to trace the result of the injury to the proximate cause set in motion by the employment, and not by some other agency. Dean v. Stockham Pipe & Fittings Co., 220 Ala. 25, 123 So. 225. A rather clear statement of the rule is to be found in Ex parte Terry, 211 Ala. 418, 100 So. 768, 769, in the following language: "The effect of these and other well-considered cases is to firmly establish the principle based of course upon the theory of a liberal rather than a strict or narrow construction, that an employe's injury may be properly held to have arisen out of his employment notwithstanding that the act or conduct of the employe to which the injury is proximately referable was not within the scope of his authority nor strictly within the line of his

duty, provided it was reasonably related to the service he was employed to render and was in good faith done or undertaken in furtherance of the employer's business; and notwithstanding, also, that the injury in question was not one of the anticipated risks of the service."

In Mobile Liners, Inc., v. McConnell, supra [220 Ala. 562, 126 So. 628], is the observation: "Whether work was reasonably related to the employee's duties, and whether done in good faith in furtherance of the employer's business, are recognized tests of whether resulting injury arose out of the employment."

In Exchange Distributing Co. v. Oslin, 229 Ala. 547, 158 So. 743, 746, the court pointed out the fact that it is not sufficient that the injury or death of the employee arose from an accident received in the course of the employment, but it must arise out of the employment. In speaking further to that question the opinion in that case observes that it is necessary to recover compensation that the occurrence should have resulted from a risk reasonably incident to the employment; that there be a causal connection between the conditions under which the employee worked and the resulting injury. The court further observed: "While the occurrence need not have been foreseen or anticipated, it must appear after the event to have had its origin in a risk connected with the employment, and to have flowed from that source, as a rational consequence."

This principle was again stressed in the more recent case of Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 8 So.2d 519, 520, from which opinion I take the following excerpts:

"But it does not follow that because the injury was accidental it was compensable, even though at the time he was on the premises of defendant and was serving in the course of his employment. Nor is the matter necessarily settled by the fact that the cause of his injury originated on said premises of defendant to which his employment caused him to be at that moment exposed. * * *

"The question always is whether his employment specially subjected him to a haz-ard of that sort, as one which may be supposed would be a natural consequence of it. * * *

"In all cases it is necessary that the duties of his employment expose him to a danger materially in excess of that to which people commonly in that locality are exposed when not situated as he was in the course of his employment."

The prevailing opinion lays much stress upon the cases of Ex parte Rosengrant, 213 Ala. 202, 104 So. 409, and Boris Const. Co. v. Haywood, 214 Ala. 162, 106 So. 799. The court in those cases concluded that the work of the employee exposed him to unusual hazards, all of which is fully explained in the opinion of Justice Foster in the case of American Fuel & Clay Products Co. v. Gilbert, 221 Ala. 44, 127 So. 540. These cases also were referred to in Dallas Mfg. Co. v. Kennemer, supra, comparing them to what is called the "street accident cases." Illustrative authorities of this line of decisions is to be found in the recent work of Horovitz on Workmen's Compensation, beginning on page 95.

As I view it, the Rosengrant and Boris Construction Company cases are without application here. The accidental shooting of Bruce occurred while he was placing a toy pistol in the holster for the pleasure of this boy. Certainly this was not a hazard anticipated by his employment and in no manner connected therewith. True enough, a night watchman by virtue of his position is exposed to more hazards than the ordinary employee, but I am unable to see that this principle has application to the facts here presented. The risk from injury so far as Bruce's employment was concerned was no more than the normal risk to which all are subject, that is, the risk of a boy playing with a loaded pistol. There are quite a number of authorities cited in the note to 71 C.J. page 692, which illustrate this principle. In 71 C.J. page 681 is the statement that an injury incurred when the employee has departed from the service of the master and is performing a voluntary service for the accommodation of another does not arise out of and in the course of employment. A number of authorities are cited in support of this principle. See also

Barragar v. Industrial Commission, 205. Wis. 550, 238 N.W. 368, 78 A.L.R. 679 (wherein stress is laid upon Marks' Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181) and authorities cited in the note thereto. Likewise authorities in the note to Railway Express Agency v. Lewis, 156 Va. 800, 159 S.E. 188, 76 A.L.R. 350. Our case of American Ry. Express Co. v. Tait, 211 Ala. 348, 100 So. 328, though not involving the workmen's compensation laws, bears some analogy. There is some analogy in those cases involving a journey or trip by a servant which includes a personal mission as well as some service for the employer. The New York Court (Chief Judge Cardozo writing) in the matter of Marks' Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181, 183, speaking of a trip by the servant wherein a personal mission was involved along with business for the employer, observed that: "To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled." The Wisconsin court in Barrager v. Industrial Commission, supra, adopted as sound this test as laid down by the New York court. Applying this principle to the instant case the approach of Bruce to the drawer wherein rested the pistol in the holster was purely a personal mission of Bruce for the purpose of securing the holster for the boy. It cannot upon any reasonable basis be questioned that this trip (so designated by way of analogy) to the drawer would not have been made but for this personal purpose. The test by the New York court is therefore equally applicable here. The same principle controls. And the cases of Cohan Bullard v. Cullman Heading Co., and Morgan v. City of Gunterville, supra, illustrate the further principle that an accident does not arise out of the employment, if, at the time, the workman is arrogating to himself duties which he was neither engaged nor entitled to perform. Clearly the principle with even greater logic be applicable when the deviation is for purely personal reasons.

To my mind when the night watchman Bruce proceeded to obtain the holster and place the toy pistol therein for his boy friend it was purely a matter of accommodation to the boy as well as for his own gratification. True, he was still night watchman, but in performing this act he was clearly departing from the scope of his employment. That the boy should have taken the 32-caliber pistol and fired it at Bruce is clearly not a risk or a danger to which Bruce was subjected by being a night watchman at the plant.

As I view in the light of reason and common sense, this tragic accident is not one within the influence of the workmen's compensation statute. Reduced to the last analysis, I am persuaded that the prevailing opinion leads to the conclusion that a night watchman is within the statute if accidently shot with a weapon belonging to the employer under any circumstances by any one on the premises and during the hours of employment, regardless of the circumstances of the injury. I cannot square such conclusion with the theory that for recovery there must be a causal connection between conditions under which the employee worked and the resulting injury. The occurrence must have had its origin, as we have often said, in a risk, connected with the employment and therefore flowed from that source as a rational consequence. The language of Exchange Distributing Co. v. Oslin, supra, is to my mind applicable here, where it was observed the dangers incurred in going on the personal mission there involved was in no wise connected with the business he was engaged in, or was this danger incidental to the character of the business in which he was employed, but was wholly independent of the relation of master and servant.

But I forego further discussion.

Finding myself unable to agree, I respectfully dissent.

Mr. Justice FOSTER concurs in the foregoing views.