90 So.2d 84

Susie Lee **WILLIAMS**

v.

**TENNESSEE VALLEY BUTANE
COMPANY.**

8 Div. 810.

Supreme Court of Alabama.

Sept. 13, 1956.

Rehearing Denied Nov. 1, 1956.

Howell T. Heflin, Tuscumbia, for appellant.

·Mitchell & Poellnitz, Florence, for appellee.

STAKELY, Justice.

Susie Lee Williams, widow of William E. Williams, instituted these proceedings to recover benefits alleged to be due to herself and her minor children under the Workmen's Compensation Laws of Alabama. § 253 et seq., Title 26, Code of 1940. It is claimed by her that these benefits grow out of the death of her husband, William E. Williams, who died on February 13, 1952, as the result of an accident suffered while acting within the line and scope of his employment with the Tennessee Valley Butane Gas Company, a corporation.

The case was heard before the court who denied the relief sought by the petition. The question for decision is whether the alleged death of William E. Williams arose out of and in the course of his employment.

The court made a finding of fact in considerable detail. We shall undertake to set out enough of the findings of fact by the court so that the case may be understood.

Tennessee Valley Butane Company is a corporation with its place of. business in Sheffield, Alabama, and C. H. Doss is its president. The deceased William E. Williams had been employed by the defendant as an installation and service man and was guaranteed employment for forty hours a week. About the last of January 1952 the deceased had gone to his home in Nashville, Tennessee, to do some work there for himself, with an understanding that he would return when and if needed. A few days before February 12, 1952, there was a telephone conversation between Doss and the deceased and the deceased agreed to return to the defendant's place of business for the principal purpose of reworking a motor in one of defendant's trucks and to do any other work that the defendant might need to have done while he was there. The deceased arrived at the defendant's place of business around 4:00 P.M. on February 12, 1952. He talked with Doss until about 4:30 P.M. on that day who at that time asked the deceased to go with another employee and check a thermostat on a furnace in a customer's house. The deceased put on his coveralls and was ready to make the call as requested but it was decided to wait until the next morning to make the call since the other employee had to leave.

The defendant's business closed that day at about 5:00 P.M. and Doss remained until about 6:00 P.M., during which time he and the deceased went in the office of Doss at the defendant's place of business and had a couple of drinks each out of a pint bottle of whiskey. ·Around 6:00 P.M. Doss left and left the remaining whiskey in the pint bottle there with deceased at the place of business. Deceased stated that he would probably stay that night at the Florence Rooming House.

It was the understanding with Doss that deceased would start to work the next morning. However in the past deceased had worked whenever he saw fit, including

nights, and deceased was paid for whatever number of hours he worked and turned in. It would have been all right with the defendant for deceased to have worked that night on the truck motor or on any other equipment in defendant's place of business which needed repairs. However Doss did not assign deceased any work to do that night and according to Doss, so far as he knew the deceased did no work that night. Doss came to the place of business after the accident, which we will hereinafter describe, and again the next morning and saw no evidence of any work that the deceased might have done that night.

According to Doss the deceased was under the same general agreement on February 12th after he returned as far as employment was concerned, that is on a forty hour a week $2 an hour guarantee.

After Doss left the defendant's place of business at about 6:00 P.M. there is no evidence to show where the deceased was or what he was doing until about 8:00 P.M. or after, at which time he went to the apartment of Mrs. Lena Cooke, whose husband was also an employee of the defendant and whose apartment was on the second story of the building in which the defendant's place of business was located. Cooke and his wife had gone to bed. When Cooke went to the door and let deceased in the apartment and the deceased asked Cooke if he wanted a drink and Cooke replied that he did, Mrs. Cooke got out of bed and put something on the kitchen table for deceased to eat and she saw deceased with a pint whiskey bottle before she returned to bed and heard him say that he was staying at the Reeder Hotel for the night. After the accident, which occurred down stairs in the defendant's place of business, Mrs. Cooke saw the pint bottle of whiskey again in her kitchen and it was empty.

At about 10:00 P.M. deceased went across the street from the defendant's place of business to the Valley Center Cafe. He drank a Coca Cola and ate a cheeseburger and stated to the waitress that he did not want anything else, that he had to get back to work. Deceased left the Valley Center Cafe about closing time which was around 11:00 P.M. and he left with one of the waitresses in the cafe, Geraldine McLemore, and her friend Freeman Harden, who was also an employee of defendant. The three of them went from the Valley Center Cafe and parked in front of the defendant's place of business. Deceased and Harden went in the defendant's place of business and "stayed a right smart while." Geraldine remained in the car until the deceased and Harden came out of the building and the deceased begged Geraldine and Harden to stay with him.

About 11:30 P.M. Mrs. Robert Richardson, who also occupied a flat on the second story of the building where the defendant's place of business was located, heard and saw deceased and Harden laughing and talking outside of defendant's place of business. Harden and Geraldine left and as they looked back toward deceased, it appeared that he was going across the street to R. D. Moore's Cafe.

After 11:00 P.M. and close to midnight, the deceased went into R. D. Moore's Cafe, which was across the street from defendant's place of business, and ordered some beer to take with him. The waitress put some cans of beer in a sack and gave them to deceased. The deceased stated that "he had some friends over there and that he was carrying the beer to them." Shortly after deceased left Moore's Cafe, the cafe closed up and when the waitress was several blocks down the street going toward Sheffield, she passed a fire truck going in the direction of Moore's Cafe and the defendant's place of business.

Deceased had phoned his wife, the plaintiff, twice on the night of February 12th, the first time between nine and ten P.M. and the second time between eleven and twelve P.M. After one of the phone calls the plaintiff phoned Doss and said that she was worried about him because he was nervous and kept calling her. Doss offered to go back to check on deceased but plain-

tiff asked him not to, that it might aggravate him. According to Doss, plaintiff stated to him that she was worried about deceased because he had gone to sleep on previous occasions and had caught the bed on fire from his cigarette.

Around twelve o'clock midnight, Mrs. Robert Richardson, the occupant of another apartment upstairs over defendant's place of business, was awakened by stomping and screaming below her. Upon running down stairs it appeared to her that the portion of the building in which the defendant's place of business was located, was on fire. She immediately called the police and the fire department. She saw deceased on fire on the curb in front of defendant's place of business. Her husband phoned for an ambulance.

The deceased was taken to the Colbert County Hospital and was there treated by Dr. D. D. Cox. His body was severely burned and it appeared to Dr. Cox that the burns were caused by fire from a highly inflammable chemical and that it was such a burn that could not have been caused merely by a "clothes fire". The doctor asked the deceased how the fire occurred and the deceased would not talk about it and refused to answer questions as to how it happened. Dr. Cox overheard the deceased making statements to the effect that he had never had anything this rough in the army and that he did not think that Johnny would do this to him. The deceased died on February 13, 1952, as a result of the burns.

Bob Price, Chief of Police, went to the defendant's place of business shortly after midnight on the morning of February 13, 1952 and found the deceased just off the sidewalk in the gutter in front of defendant's place of business. The only clothes on deceased at this time were his undershirt, shorts, shoes and socks. These were on fire and were pulled off of him. Some of the clothes of deceased were scattered on the inside and the outside of the building. There were two couches in the back part of defendant's place of business where

the fire occurred. One couch was burned on the right arm and the other couch was burned in the middle cushion. The couch with the burned place in the middle cushion appeared to be burned more than the other and on that couch were some tools which belonged to the deceased and which he had apparently brought with him from Nashville on February 12th. There were cigarettes and matches on the floor around where the sofa was in the back of the building and there were some scorched places on the floor in the same portion of the building. The policeman did not find or smell any gas or anything else on the premises that appeared to have caused the fire in the building. He saw some Butane Gas Containers in the building but they had not been tampered with or opened. Neither the policeman nor the doctor smelled any alcohol on the breath of the deceased. When the policeman was in the presence of the deceased, the deceased made some statements to the effect that it happened while he was trying to get a woman and some children out of a barn on fire and that it was a "hell of a note to get mixed up with in-laws". Deceased also kept referring to a Johnny. In the opinion of the policeman deceased was not rational at that time.

The motor of the truck on which the deceased was going to work was in the defendant's place of business at the time deceased returned from Nashville and it was also in the building the next morning after the accident. There is no evidence as to whether or not any work had been done on the motor or on anything else in the defendant's place of business during the night of February 12th.

■ There is no doubt that in order for compensation to be awarded for an employee's death, the accident that caused death must have arisen out of and in the course of his employment. In order to satisfy this requisite the rational mind must be able to trace the resulting injury to a proximate cause set in motion by employment and not otherwise.—Southern Cotton

Oil Co. v. Bruce, 249 Ala. 675, 32 So.2d 666; Alabama Pipe Co. v. Wofford, 253 Ala. 610, 46 So.2d 404.

  The Workmen's Compensation Law under our cases should be liberally construed in favor of the workman, but this does not mean that the rule as to the measure of proof of the sufficiency of evidence is different from the rule in ordinary cases. "The burden is on the plaintiff to reasonably satisfy the trial court that the accident arose out of and in the course of the workman's employment, and, where there is any substantial legal evidence in support of the finding of the trial court, the judgment, whether affirmative or negative, will not be disturbed on appeal. * * *."—Ex parte Coleman, 211 Ala. 248, 100 So. 114, 115; Foster v. Continental Gin Co., 261 Ala. 366, 74 So.2d 474.

 The court held that it could not conclude that the deceased's death was caused by an accident arising out of and in the course of his employment. And the court in its opinion refers to what was recently said by this Court in the case of Alabama Pipe Co. v. Wofford, supra [253 Ala. 610, 46 So.2d 406], as follows: "Usually, as in this case, the facts present aspects of strong sympathetic appeal. But it must be steadily borne in mind that we can't guess a defendant into liability and without proof in the instant case that there was a causal relation or connection between the deceased's death and his hazard of employment, it would be only conjectural that his death resulted from an accident arising out of and in the course of his employment."

 This Court has often said that in cases of this character it will not weigh the evidence but will only look to see if there is any evidence which reasonably supports the judgment of the lower court. Houser v. Young, 247 Ala. 562, 25 So.2d 421. Under the circumstances we think that there was evidence to support reasonably the findings of the lower court and, therefore, the judgment is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.