(134 So. 643)

### SOUTHERN RY. CO. v. BROWN.
### 6 Div. 667.

Supreme Court of Alabama.
April 2, 1931.

Rehearing Denied May 28, 1931.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

London, Yancey & Brower, R. D. Coffman, and Whit Windham, all of Birmingham, for appellee.

THOMAS, J.

The suit was for compensation as a widow of the employee, and there was judgment for the petitioner. The pleading consisted merely of the petition and answer.

The defendant insists there is no legal evidence authorizing the conclusion of the trial court that the deceased husband, when shot, was (1) acting within the line and scope of his employment; (2) or, if so, that the work he was performing at the time and place brought him and petitioner within the influence of the Federal Employers' Liability Act (45 USCA §§ 51–59).

Deceased was, for some time prior to and at his death, employed by defendant as a special or railroad policeman; was shot and killed about 6 o'clock the morning of February 27, 1929, by a negro known as "Mobile"

whom he had placed under arrest. Brown's duties were to ride certain interstate trains from Birmingham to Attalla and return, running at night, and guard these trains and their freight and thereafter inspecting portions of the yards. That is to say, his duties also required that, after reaching Birmingham on the return trip, he patrol the railroad's yards known as "Woodlawn yard" and guard and protect the railroad equipment and property, together with freight on that yard. He usually went on duty about 6 p. m., and remained on duty until about 6 a. m., although he was not paid by the hour, and his hours of duty were not rigidly fixed.

The night before he was shot, pursuant to orders he had ridden one of these interstate trains to Attalla, and returned to Birmingham on the other, guarding them as was his duty, and reached Birmingham about 3 o'clock in the morning. This was the last seen of him until he showed up at the house of a negro woman by the name of Ruby Donaldson with the negro "Mobile" under arrest. From conversations admitted in evidence, it appeared that deceased had arrested Mobile for stealing brasses, and at Mobile's request had taken him by his house near by in order that Mobile might change his clothes. It was shown that the "brass" referred to is the brass part of a railroad freight car either loaded or empty, which performs the function of a bearing for the axle of the car, and that much of such brass had recently been stolen. During the time that Brown and "Mobile" were at the house of Ruby Donaldson, Brown was shot and killed by "Mobile" after the latter's attempt to escape and recapture by Brown.

The Woodlawn yard of the defendant was used by it for several purposes; for the storage of empty freight cars, principally for the temporary storage of interstate cars, both loaded and empty, arriving in Birmingham, and for the handling of interstate and intrastate shipments (car load) to certain industries located adjoining the yard, when required for such purpose. It was also shown that the Woodlawn Depot of defendant is located within the limits of this yard. The evidence did not show cars containing interstate freight were in the Woodlawn yard between the time Brown arrived in Birmingham and the time he was shot, except as to three cars specifically described and set out in the decree.

It is stated as to this in the finding of facts as follows:

"The so-called Woodlawn Yards of the Southern Railway Company for some while prior to the shooting and death of William A. Brown had been used principally for the storing of empty freight cars, although, occasionally, a train with loaded cars, including at times interstate cars, with interstate shipments therein, not being able for lack of space to draw on down into the yards between the Woodlawn Yards and the City of Birmingham proper, to-wit, into the Avondale Yards, would be left in the Woodlawn Yards for the time being. There was a freight station house of the Southern Railway Company located in the Woodlawn yards with an agent in charge thereof, and freight for consignee in that vicinity was shipped merely to Woodlawn, Alabama. During the several hours that William A. Brown was patrolling these yards in the early morning of February 27th, 1929, the Woodlawn yards were rather well filled with empty freight cars. There were no interstate shipments that came into these yards between the time William A. Brown began to patrol the same at about three o'clock A. M. on February 27th, 1929, until such time as he met his death on the same morning. During the hours that William A. Brown was engaged in performing the services heretofore named in the said Woodlawn yards from three o'clock A. M. to approximately six o'clock A. M. on the morning of February 27th, 1929, there were in the said Woodlawn Yards no loaded cars and no shipments in cars which, at any time, had been of an interstate nature, or could be related to interstate commerce in any way, except the three cars hereinbelow named:

"(1) A Southern car, containing machinery from Columbus, Ga. consigned to the Peerless Machinery Company, at Woodlawn, Alabama, which arrived at Woodlawn, Alabama, on the 26th of February, 1929, and was placed for unloading between six P. M. and midnight of February 26th, 1929.

"(2) A Southern car containing scrap iron from Knoxville, Tenn., consigned to the Connors Steel Company, at Woodlawn, Alabama, and received at Woodlawn, Alabama, at seven-thirty P. M. on February 25th, 1929, and placed on a spur track at the plant of the Connors Steel Company for unloading at eleven A. M. on February 26th, 1929.

"(3) A Pennsylvania Car containing machinery from Cincinnati, Ohio, and consigned to the Independent Paving Company at Avondale, Alabama, and received at Avondale, Alabama, at seven P. M. on February 25th, 1929, and placed for unloading at nine-twenty A. M. on February 26th, 1929, at the plant of the Independent Paving Company in the so-called Avondale yards, which lay just immediately West of the so-called Woodlawn yards.

"Each of the cars above named had reached its final destination, and had been placed for unloading prior to the time that William A. Brown left Southern train #51 and began to patrol the yards at three o'clock A. M. on February 27th, 1929. There was no evidence that either of these cars had been molested in any way, either as to the brasses thereon or as to the contents of the car.

"The court further finds that it was the duty of the said William A. Brown, under his employment by the defendant, to arrest and take to jail any person caught stealing, or preparing to steal or molest the property of the defendant; and that the said William A. Brown had arrested the negro, 'Mobile', in the act of stealing, or preparing to steal, or otherwise molest brasses of the defendant in its Woodlawn yards in Birmingham, Alabama, and it does not appear that this act of Brown in arresting the negro, 'Mobile', was in furtherance of interstate commerce."

And at the risk of repetition, we may say it is clearly shown that said Brown on the night of his injury and death was in the employ of defendant; his work was that of patrolman governed by instructions given by his superior, White, "the Captain of Police" for defendant; that the latter had instructed "him to protect the company's property, ride trains, patrol the yards, or anything that I might assign him to." Pursuant to and under such assignment, Brown had ridden Southern train from Birmingham to Attalla, returned to Birmingham on train No. 51 several hours preceding his death, got off at Woodlawn junction near the Woodlawn yard, of defendant and proceeded "to look out for brass thieves" east of Spring street. He was specifically instructed by White, his chief, "to ride these two freight trains and work East of Spring Street and look out for brass thieves."

The evidence further shows that having worked the trains and returned to Birmingham at Woodlawn yard, looking for brass thieves east of Spring or Forty-First street, in that service and pursuant to superior instructions, Brown made the arrest in question of a man named "Mobile," was carrying him to jail, and at request went by his house about a block away. The detailed conversation with "Mobile" at the woman's house shows he was under arrest for stealing "brass down there in the yard," and that the prisoner was under suspicion when arrested and carried to the house of Donaldson near the "Avenue and car line." There is no reasonable inference in the evidence that it was improper to have carried the prisoner by his house, and acceding to the request made, was a natural and humane thing to have done. The house where Brown was killed is immediately on the street car line coming into Birmingham and about a block from the scene of the arrest.

It should be said, if there is an element of interstate commerce in a traffic or employment culminating in Brown's death, it would have determined the remedy of the employee of said company, and the burden of avoidance or going forward with the evidence in avoidance of operation of federal statute would be upon her who asserted that defense. New

York Central Ry. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139; Philadelphia & R. Ry. Co. v. Polk, 256 U. S. 332, 41 S. Ct. 518, 65 L. Ed. 958; Philadelphia & R. Ry. Co. v. Di Donato, 256 U. S. 327, 41 S. Ct. 516, 65 L. Ed. 958. See, Fitzgerald v. Great Northern Ry. Co., 157 Minn. 412, 196 N. W. 657; Southern Ry. Co. v. Varnell, 222 Ala. 237, 131 So. 803.

 The federal decisions are to the effect that the character of the service being performed denotes its classification, and declares whether the state or federal rule will be applied.

The record of cars of interstate character in said yard during the time Brown was engaged in inspection after he alighted from train No. 51 to the time of his death was in evidence. The train sheet contained the original dates of arrival and destinations of the three cars in question. The record showed, or found by the court, that the car from Columbus, Ga., had reached its destination and was placed for unloading before Brown entered the yard; that the car from Knoxville to Connors Steel Company reached its destination early in the evening and was placed for unloading across the street from Woodlawn yard at or before Brown was shot; and that the car from Cincinnati was placed for unloading at 9:20 a. m. February 26th on the track of consignee "down there in Avondale" or about three hundred feet west of the crossing, and this was many hours before Brown went on patrol and was not within his district of patrol.

There was evidence to sustain the court's finding as to the nature and character of Brown's duties, one of which was to watch out particularly for brass thieves; that in so doing he arrested "Mobile" at the time, place, and in the act of discharging the duties of his employment and assignment; that in so doing decedent was not in furtherance of interstate commerce, as shown by the detailed or record history of the three interstate cars; that they each reached their respective destinations and were respectively placed for unloading long prior to the time in question—prior to the patrol of the yards by deceased which began at or about 3 o'clock in the morning on February 27, 1929.

It follows that the state, and not the federal, statutes have application. Such was the finding and application by the trial court.

 There was legal evidence supporting the findings of each material fact (Ex parte Sloss-Sheffield S. & I. Co. [Greek's Case], 207 Ala. 219, 92 So. 458; Martin v. Sloss-Sheffield S. & I. Co., 216 Ala. 500, 113 So. 578; Ex parte Louisville & N. R. Co. [House's Case], 208 Ala. 216, 94 So. 289; Hardisty v. Woodward Iron Co., 214 Ala. 256, 107 So. 837) that

144

the injury and death arose out of the employment (Ex parte Majestic Coal Co. [Polo's Case], 208 Ala. 86, 93 So. 728, and authorities; Ex parte Louisville & N. R. Co. [House's Case], 208 Ala. 216, 94 So. 289); that the patrolling for brass thieves under the conditions existing as found at said yard bore no direct causal relation to and in furtherance of interstate commerce, and was not within the protection of the federal statute (New York Cent. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629); that the three cars in the yard which had formerly been engaged in interstate commerce had ended their respective journeys and had been finally placed for unloading were not thereafter, as affecting the acts of the deceased, engaged in or characterized as interstate commerce (Chicago, etc., Co. v. Harrington, 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941; Lehigh, etc., Co. v. Barlow, 244 U. S. 183, 37 S. Ct. 515, 61 L. Ed. 1070; Southern Ry. Co. v. Varnell, 222 Ala. 237, 131 So. 803, and cases there cited).

We find no reversible error committed in the trial. It follows that the writ is denied, and judgment of the circuit court is affirmed, viz., Southern Ry. Co. v. Varnell, 222 Ala. 237, 131 So. 803.

Writ denied, and judgment affirmed.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.