COBB, Chief Justice
(dissenting).
I respectfully dissent from this Court’s decision to quash the writ in this case. I would review the decision of the Court of *462 Civil Appeals. I believe substantial evidence demonstrates that N.J.J.’s workplace created an increased danger of an assault, that no substantial evidence supports the trial court’s conclusion to the contrary, and that N.J.J. is entitled to worker’s compensation benefits.
In August 2002, N.J.J. was 38 years old and was employed by Wesfam Restaurants, Inc., d/b/a Burger King (“Burger King”), as the store manager for the Burger King restaurant on South Memorial Parkway in Huntsville. Sometime during August 2002, a shift manager reported to N.J.J. that some teenagers were making noise in the dining room of the restaurant. N.J.J. approached the teenagers and saw that one of them had set a napkin holder on fire. N.J.J. recognized D.S. as the one in the group who lit the fire. N.J.J. told D.S. to leave. N.J.J. had never talked to D.S. outside the restaurant and did not know him from anywhere else.
On August 11, 2002, N.J.J. went to work between 3:30 and 4:30 a.m. to do office paperwork. The record reflects that, on the days when N.J.J. did not arrive at work early to do paperwork, she reported to work at 5:00 a.m. N.J.J. testified about the reason for her early arrival at work on August 11, 2002, as follows:
“It was on a Sunday morning and I came in early to do paperwork. We usually have a day manager that would come in at 7:00 to do the paperwork, but I came in as a restaurant manager and did it before we opened — or planned on doing it before we opened. So I allowed myself the extra time. I did that often.”
When N.J.J. arrived at work that morning, she drove around the restaurant looking for suspicious activity. Seeing nothing suspicious, she parked her car and began walking to the doors of the restaurant. As N.J.J. was attempting to enter the restaurant, two white males whom N.J.J. had never seen before grabbed her and forced her behind the restaurant. The area behind the restaurant between the back of the building and the dumpster was “a well-lit area,” so the men pushed N.J.J. farther into the dumpster area near some concrete barriers. As they forced N.J.J. behind the restaurant, the two men told N.J.J. they were going to show her “what they do to nigger-lovers,” and they repeated this statement several times during the attack. The two men hit, slapped, and verbally berated N.J.J., ripped and cut her clothes off, and smashed her face against a wall. They burned her with cigarettes and cut her with a knife, and they raped her. A third man, whom N.J.J. recognized as D.S., served as a lookout while the two strangers assaulted her.
N.J.J.’s attackers did not make any specific statements during the attack to indicate that they felt she was a “nigger lover” because of the way she treated employees or customers at the Burger King restaurant. N.J.J.’s attackers also did not make any specific statements during the attack to indicate that they felt she was a “nigger lover” because she, a white woman, was married to an African-American man. The attackers also did not state whether they knew N.J.J.’s husband was an African-American. N.J.J. recognized D.S. solely from her interaction with him at the restaurant, and she had never seen the two assailants before.
A Burger King employee discovered N.J.J. lying unconscious and partially clothed in the shrubbery outside the dumpster area around 5:15 a.m. on the morning of the attack. A three-foot-long metal dustpan handle was in N.JJ.’s vagina. An ambulance took her to Huntsville Hospital, where she was treated for injuries sustained during the assault. The doctors removed the metal dustpan handle from NJ.J.’s vagina and treated her other *463 injuries, including abrasions and lacerations to her body, face, and genitals. N.J.J. subsequently underwent psychiatric treatment and was treated for back injuries sustained in the attack.
N.J.J. believes the attackers assaulted her because she banned D.S. from the restaurant, although her attackers made no references to the napkin-burning incident or to the fact that she had banned D.S. from the restaurant. During the ensuing police investigation, D.S. gave police an alibi for the time of the incident. The police contacted one of D.S.’s friends to investigate his alibi. The friend stated that he telephoned his girlfriend’s house between 5:00 and 5:30 a.m. on August 11, 2002, and spoke to D.S., who was there. The police did not verily D.S.’s alibi for the time of the attack. D.S. also took a polygraph test, which did not indicate that he was being deceptive when D.S. denied participating in the attack. D.S. was not prosecuted. The only disputed issue of fact in this case is whether D.S. was present during the attack. Burger King questions whether D.S. was present during the attack, while N.J.J. testified unequivocally that he was. The trial court’s order makes clear that the trial court did not resolve this dispute in reaching its findings. The trial court noted evidence indicating that D.S. gave the police an alibi and that a polygraph test indicated no deception when D.S. denied being present during the attack. However, the trial court also noted N.J.J.’s testimony that D.S. was present and “asked the two attackers not to burn [N.J.J.] with a cigarette and further asked the two attackers to leave.”[6]
After a nonjury trial, the trial court in N.J.J.’s worker’s compensation action found that N.J.J. did not sustain a compen-sable injury under § 25-5-1(9), Ala.Code 1975, because, it reasoned, her injuries were caused by the acts of third parties who intended to injure her for reasons personal to them and not directed against her as an employee or resulting from her employment.
The Court of Civil Appeals affirmed the trial court’s judgment, without an opinion. N.J.J. v. Wesfam Rests., Inc., d/b/a Burger King (No. 2060444, October 12, 2007), — So.3d-(Ala.Civ.App.2007) (table).
I note the following standard of review applies when an appellate court reviews a worker’s compensation case: “An appellate court reviews the burden of proof applied at trial and other legal issues in workers’ compensation claims without a presumption of correctness.” Ex parte USX Corp., 881 So.2d 437, 441 (Ala.2003) (citing Ala. Code 1975, § 25-5-81(e)(1)); Ex parte Drummond Co., 837 So.2d 831, 832 (Ala.2002). However, “[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” § 25-5-81(e)(2), Ala.Code 1975.
Under § 25-5-1(9), Ala.Code 1975, known as Alabama’s “special-assault statute,” the Workers’ Compensation Act does *464 not apply to and a claimant will be denied benefits for an
“injury caused by the act of a third person or fellow employee intended to injure the employee because of reasons personal to him or her and not directed against him or her as an employee or because of his or her employment.”
(Emphasis added.)
By operation of the word “and” in the above-quoted portion of § 25-5-1(9), Ala. Code 1975, the special-assault statute will not bar worker’s compensation benefits in this case if N.J.J.’s injuries were not “caused by the act of a third person or fellow employee intended to injure the employee because of reasons personal to him or her” or if the injurious acts were “directed against [N.J.J.] as an employee or because of ... her employment.” Harris v. Sloss-Sheffield Steel & Iron Co., 222 Ala. 470, 471, 132 So. 727, 727 (1931) (noting that the special-assault statute “does not exclude all cases where the assault is ‘intended to injure the employee because of reasons personal to him,’ but adds: ‘And not directed against him as an employee, or because of his employment ’ ” (quoting Ala.Code 1923, § 7596(J)[7])); Dean v. Stockham Pipe & Fittings Co., 220 Ala. 25, 123 So. 225 (1929); 1 Terry A. Moore, Alabama Workers’ Compensation § 10:31 (1998).
Our courts have developed a test for determining whether injurious acts of third parties are “directed against [the worker] as an employee or because of his or her employment.” § 25-5-1(9), Ala. Code 1975. “To prove that the assault was directed at the employee as an employee or because of the employment, the claimant must show a causal relation between the employment and the assault.” Moore, § 10:24. “[T]he assault will be considered an accident arising out of the employment if the employment subjected the employee to a hazard of assault he or she would not be exposed to equally apart from his or her employment.” Id. “The employment may materially increase the risk of assault in essentially two ways: the nature of the employment duties may naturally expose the employee to a greater probability of being assaulted or the environment in which the employee works may subject the worker to an increased risk of assault.” Id. § 10:25 (citing Southern Cotton Oil Co. v. Bruce, 249 Ala. 675, 32 So.2d 666 (1947); Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 8 So.2d 519 (1942); Howard Odorless Cleaners, Inc. v. Blevins, 237 Ala. 210, 186 So. 141 (1939); Republic Iron & Steel Co. v. Ingle, 223 Ala. 127, 134 So. 878 (1931); Southern Ry. v. Brown, 223 Ala. 140, 134 So. 643 (1931); Dean v. Stockham Pipe & Fittings Co., 220 Ala. 25, 123 So. 225 (1929); and McLaughlin v. Davis Lumber Co., 220 Ala. 440, 125 So. 608 (1929)).
A long history of caselaw in our state has consistently applied the principle that, in the absence of some causal connection between the injury and the employment, the mere fact that the employment put the employee in the place where he or she was injured is not sufficient to demonstrate that an employee was attacked “because of his or her employment,” § 25-5-1(9), Ala. Code 1975. See Harris v. Sloss-Sheffield Steel & Iron Co., 222 Ala. at 471, 132 So. at 727; Jacobs v. Bowden Elec. Co., 601 So.2d 1021 (Ala.Civ.App.1992); and Dallas Mfg. Co. v. Kennemer, supra.
However, our courts have also long recognized that an employee is attacked “because of his or her employment,” within the meaning of the special-assault statute, when the employment not only furnishes the setting and opportunity for the attack, *465 but also exposes the worker “to a danger materially in excess of that to which people commonly in that locality are exposed when not situated as [the injured employee] was in the course of his employment.” Dallas Mfg. Co. v. Kennemer, 243 Ala. at 44, 8 So.2d at 520. Therefore, when an employee demonstrates that the workplace setting itself increased the risk that the worker would be the victim of an of attack or injury caused by a third party, then the employee has demonstrated the requisite causal link between the employment and the injury, and the special-assault statute does not exclude the worker from eligibility for worker’s compensation benefits, even if the attacker’s motivation was entirely personal. See, e.g., Dean v. Stockham Pipe & Fittings Co., 220 Ala. at 29, 123 So. at 228 (finding that the predecessor to the special-assault statute did not bar recovery where a night watchman was robbed and murdered for reasons entirely personal to the attacker, because the night watchman’s job placed him alone on the employer’s premises at night with money in his pocket, “thus furnishing an opportunity for robbery without interference — a risk beyond the common risk” (quoting Lanni v. Amsterdam Bldg. Co., 217 A.D. 278, 216 N.Y.S. 763 (1926))); but see Dallas Mfg. Co. v. Kennemer, supra (holding that no causal relation existed between the employment and injury where the injured employee was struck by an errant bullet from the pistol of the angry wife of another employee who came to the workplace and attempted to shoot a third employee with whom she had been having an affair, because the employment did not “specially expose [the injured employee] to a hazard of this sort”), and Hams v. Sloss-Sheffield Steel & Iron Co., supra (finding that the predecessor to the special-assault statute barred recovery where the employee did not show that a workplace injury was caused by an increased risk of injury inherent in the workplace); cf. Southern Cotton Oil Co. v. Bruce, 249 Ala. 675, 679-80, 32 So.2d 666, 669-70 (1947) (noting that “ ‘the employment caused the exposure to the risk’ ” of a fatal gunshot wound caused when a boy playing with a pistol accidentally shot an employee whose job required him to carry and be around pistols; the Court reasoned that firearm accidents are “unquestionably a hazard peculiar to the employment of a ... person whose duties require the use of firearms”); Boris Constr. Co. v. Haywood, 214 Ala. 162, 106 So. 799 (1925) (holding that a delivery truck driver’s employment “caused the exposure to the risk” of injury, where a small boy accidentally shot and killed the truck driver in front of the employer’s place of business while the truck driver was stepping into his delivery truck to make a delivery for the employer); and Ex parte Rosengrant, 213 Ala. 202, 104 So. 409 (1925) (holding that a causal relation existed between an employee’s gunshot wound and the employment because the employee’s job, which caused him to be among barges tallying lumber as it was removed from a barge, exposed him to “hazards from loafing and working crews” on other boats to which he would not otherwise have been exposed).
In this case, the trial court found that the attack on N.J.J. was “racially motivated.” A finding that an attack was “racially motivated” does not answer the legal question of whether “the employment subjected [N.J.J.] to a hazard of assault ... she would not be exposed to equally apart from ... her employment.” Moore, § 10:24. If workplace hazards were a contributing factor in the attack, then, as a matter of law, the injurious acts were “directed against N.J.J. as an employee or because of her employment,” regardless of whether the attackers’ motivation was *466 “personal to them” and “racial.” See Dean, supra; Harris, supra.
I recognize that N.J.J. could have developed the record more fully as to whether the dangers inherent in the parking lot of the Burger King restaurant when she arrived in the darkness of the early morning were factors that increased her risk of attack beyond that of a normal citizen not employed as a manager of a fast-food restaurant. However, the record contains substantial evidence indicating that N.J.J.’s employment, which placed her in the Burger King parking lot in the early morning hours, did expose N.J.J. to an increased risk of attack. N.J.J.’s undisputed testimony established that she was acting in her position “as restaurant manager” when she arrived at the Burger King restaurant between 3:30 and 4:00 a.m. to report to work. From the facts presented, it can readily be inferred that the parking lot of the Burger King restaurant was a place where three men had little difficulty carrying out an extensive, coordinated, terrible assault on N.J.J. without detection between 3:30 a.m. and 4:00 a.m. Moreover, the fact that N.J.J. felt the need to drive around the parking lot looking for suspicious activity before getting out of her car demonstrates that a reasonable person who was familiar with the parking lot of the Burger King restaurant and the surrounding environment would understand that the parking lot posed an increased hazard of an attack at that time of the morning.[8] Thus, although N.J.J. could have developed a more elaborate record as to the fact that the parking lot posed an increased hazard in the predawn hours, the record contains substantial evidence indicating that N.J.J.’s early-morning work environment increased her risk of being attacked and that her duties “as restaurant manager” placed her in that environment at that time.
Moreover, in similar cases, our courts have not required expert testimony, local crime statistics, or other such evidence to establish that, when workplace conditions place the employee alone on the employer’s premises at night, the workplace creates an increased risk that the employee will be attacked. Rather, this Court has stated, as a matter of law and reason, that “‘crimes of violence flourish under cover of the night and darkness,’ ” Dean, 220 Ala. at 29, 123 So. at 228 (quoting Heide-mann v. American Dist. Tel. Co., 230 N.Y. 305, 308, 130 N.E. 302, 303 (1921) (Cardozo, J.)). In Dean, for example, this Court adopted the reasoning of another court that, where a night watchman’s “ ‘employment placed him alone on the premises with his wages in his pocket,’ ” the employment thus “furnishe[d] an opportunity for robbery without interference — a risk beyond the common risk.” 220 Ala. at 29,. 123 So. at 228 (quoting Lanni v. Amsterdam Bldg. Co., 217 A.D. at 279, 216 N.Y.S. at 764); cf., e.g., Bruce, 249 Ala. at 680, 32 So.2d at 670 (“When guns are handled shooting accidents can be expected. Such an accident is unquestionably a hazard peculiar to the employment of a ... person whose duties require the use of firearms.”); Rosengrant, 213 Ala. at 205, 104 So. at 412 (observing that the injured employee’s “duties ... called him to this place, where ... barges with crews were coming and going. This exposed him to hazards from loafing and working crews on these boats, to which he would not otherwise have been subjected.”).
I also note that N.J.J. could have more fully developed the record with regard to whether, as the manager of the Burger King restaurant, she was required to ob *467 tain Burger King’s approval of her work hours and whether Burger King generally made a practice of reviewing or approving .her work schedule in advance. N.J.J. could also have created a more complete record as to whether, as is often the case with restaurant managers, she was responsible for setting the work schedules of all store employees, including her own. Nevertheless, I respectfully disagree with Justice Smith’s conclusion that, when viewed in the light most favorable to the trial court’s findings, evidence indicating that N.J.J. set her own schedule on the day of the attack, combined •with a lack of evidence of whether Burger King acquiesced in N.J.J.’s practice of “often” arriving at work early to do paperwork, provides reasonable support for the trial court’s judgment.
In this regard, Justice Smith finds significance in statements of other Burger King employees included in the police report of the assault. Those statements convey that, before the day of the attack, N.J.J. changed her work schedule so that she would start work at 4:00 a.m. on the day of the attack instead of her usual 5:00 a.m. start time. Although I agree that this evidence reasonably supports the inference that N.J.J. set her own schedule to arrive early on the day of the attack,[9] this evidence simply does not shed any light on whether N.J.J. was (or was not) required to schedule an early arrival for the day of the attack. Therefore, I cannot agree with Justice Smith that such evidence reasonably supports the inference that N.J.J.’s employment did not require her to be at work at 4:00 a.m.[10]
In fact, the only evidence as to whether N.J.J. was operating within her job responsibilities and requirements as a restaurant manager in arriving early to complete paperwork was N.J.J.’s testimony that she “came in as a restaurant manager and did [the paperwork] before we opened — or planned on doing it before we opened. So I allowed myself the extra time. I did that often.” That evidence is uncontradicted and léaves no room for an inference that N.J.J.’s early arrival was not a function of her responsibilities “as a restaurant manager.” See § 25-5-1(9), Ala.Code 1975 (“ ‘Injury and personal injury’ shall mean only injury by accident arising out of and in the course of the employment .... ”).
Justice Smith and Burger King also rely on testimony from N.J.J. that the restaurant parking lot was “well-lit” as substantial evidence indicating that N.J.J. was not exposed to an increased risk of attack by being in the parking lot between 3:30 and 4:00 a.m. However, N.J.J. did not testify that the parking lot was “well-lit,” only that a portion of the parking lot was “well-lit.” The record contains no evidence as to whether the level of lighting in the Burger King parking lot made the parking lot safe for workers arriving in the pre-dawn hours. Even if I were to speculate that the lighting in the parking lot ameliorated the risk of attack to some degree, the record contains no evidence indicating that the lighting in the parking lot so reduced *468 the risk of attack in the pre-dawn hours that N.J.J. ’s risk of attack was no greater than that of other people in the area “not situated as [s]he was in the course of [her] employment.” Dallas Mfg. Co. v. Ken-nemer, 243 Ala. at 44, 8 So.2d at 520 (emphasis added). Thus, the fact that the parking lot was “well-lit,” even if true, does not reasonably support the trial court’s conclusion that N.J.J.’s injury was not caused by her employment.
In sum, substantial evidence exists in this record indicating that, by placing N.J.J., a female, alone in the Burger King parking lot around 3:30 a.m., N.JJ.’s employment furnished an opportunity for rape and assault without interference, a risk that exceeded the risk that N.J.J. would have been subjected to in other employment. Cf. Dean, 220 Ala. at 29,123 So. at 228. Conversely, the record contains no evidence to support a finding that the parking lot did not pose a risk of rape and assault materially in excess of that faced by ordinary citizens not reporting to work in the parking lot of a Burger King fast-food restaurant alone at 3:30 in the morning. See Dallas Mfg. Co. v. Kennemer, 243 Ala. at 44, 8 So.2d at 520. On this record, a conclusion by the trial court that the parking lot did not create an increased risk of attack would have been unsupported by the evidence and plainly erroneous.
I share Justice Smith’s respect for the ore tenus rule and her concern that this Court must never substitute its judgment for the trial court’s by failing to draw all reasonable factual inferences favorable to the trial court’s factual findings. However, the ore tenus standard of review does not permit this Court to affirm a trial court’s judgment when, “after considering all the evidence and all reasonable inferences that can be drawn therefrom, [this Court] concludes that the judgment is plainly and palpably wrong, manifestly unjust, or without supporting evidence.” Boggan v. Judicial Inquiry Comm’n, 759 So.2d 550, 555 (Ala.1999) (emphasis added). I conclude that the trial court erred in finding that N.J.J.’s employment did not subject her to an increased risk of attack because I find no evidence in the record that reasonably supports that conclusion, not because I have reweighed conflicting evidence to find that, on balance, another conclusion or inference is more probable. See Friedman v. Friedman, 971 So.2d 23, 28 (Ala.2007) (“Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court. ... [I]t is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact. ... [A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.” (internal quotation marks omitted)).
Finally, I note that policy concerns do not preclude a holding that a worker attacked on workplace property while arriving at (or leaving) work at night is entitled to workers’ compensation benefits if the environment increases the risk of attack. Such a holding would be consistent with Alabama law governing which workplace injuries are compensable under the Workers’ Compensation Act.
“Generally, Alabama law has held that injuries sustained in accidents that occur while an employee is traveling to and from work are not covered under the Act because those injuries do not meet the ‘arising out of and in the course of employment’ requirement. Alabama courts have carved out only a few exceptions to this general rule:
“ ‘Such exceptions include situations where ... the accident occurs on the employer’s property or on public *469 property that is tantamount to the employee’s ingress to and egress from the employer’s property ...
“An additional exception to the general rule arises when an employee, during his travel to and from work, is engaged in some duty for his employer that is in furtherance of the employer’s business.”
Ex parte Shelby Comity Health Care Auth., 850 So.2d 332, 336 (Ala.2002) (emphasis added) (citations omitted); cf. Hughes v. Decatur Gen. Hosp., 514 So.2d 935, 937 (Ala.1987) (“Most courts consider parking lots owned or maintained by an employer as part of the employer’s premises whether the lots are within the main company premises or separated from it.”); Thompson v. Anserall, Inc., 522 So.2d 284, 286 (Ala.Civ.App.1988) (“ ‘[T]he employment is not limited by the actual time when the workman reaches the scene of his labor and begins it nor when he ceases, but includes a reasonable time, space, and opportunity before and after while he is at or near his place of employment.’ ” (quoting Barnett v. Britling Cafeteria Co., 225 Ala. 462, 463, 143 So. 813, 813 (1932))).
If the special-assault statute operates to exclude injuries such as those suffered by N.J.J. from the definition of injuries com-pensable under the Workers’ Compensation Act, then employers will be liable for such injuries, if at all, under the broader remedies afforded by tort law, rather than for the more limited recovery available under the Workers’ Compensation Act. Lawman v. Piedmont Exec. Shirt Mfg. Co., 547 So.2d 90, 93 (Ala.1989) (“[I]f an accident is not compensable because it is outside the coverage of the Act, then the exclusive remedy provisions of the Act are also inapplicable. Thus, an employer is protected from tort liability only as to injuries expressly covered by the language of the Act.”); cf, e.g., Rose v. Cadillac Fairview Shopping Ctr. Props. (De.) Inc., 668 A.2d 782 (Del.Super.Ct.1995) (holding that the Delaware workers’ compensation statute was the exclusive remedy and barred the tort action of a Sears Roebuck & Co. employee who was abducted from her employer’s parking lot and raped when she arrived 55 minutes early to work).
In conclusion, this case is indistinguishable from Dean. In Dean, the night watchman had something his attackers wanted— his money, which he was carrying on his person. Because of his service to his employers, he was in a place of increased vulnerability that suggested to the robbers the opportunity to capitalize on their wholly personal desire to rob Mr. Dean. Likewise, in this case, N.J.J. had something personal to her that her attackers wanted. Although evidence exists that could support a finding that the attackers wanted to retaliate against N.J.J. for banning D.S. from the restaurant, substantial evidence supports the trial court’s conclusion that N.J.J.’s attackers’ motivation was entirely personal, regardless of whether her attackers wanted to molest her because she was a female or because of some desire to exact vengeance on N.J.J. because they perceived her as “nigger-lover.”[11] However, the evidence in this case leads only to the conclusion that, because of her service to her employer, N.J.J. was in a place *470 of increased vulnerability that suggested to the attackers the opportunity to capitalize on their personal desire to rape and attack her. The attackers knew N.J.J. was alone in an isolated parking lot, and this exposure incident to her employment furnished and suggested to the attackers their opportunity, and so had a causal connection with the assault. Cf. Dean, 220 Ala. at 28, 123 So. at 227 (distinguishing Common Sch. Dist. v. District Court, 140 Minn. 470, 168 N.W. 555 (1918)). “If the hazard peculiar to the employment is a contributing cause, it matters not whether violence was directed to [the employee] as an employee.” Dean, 220 Ala. at 28, 123 So. at 227 (emphasis added). Therefore, as in Dean, the special-assault statute does not operate as a bar to worker’s compensation benefits.
Because substantial evidence demonstrates that N.J.J.’s workplace created an increased risk of attack, and because substantial evidence does not exist upon which the trial court could have concluded otherwise, I believe the trial court’s judgment is plainly and palpably wrong, and the Court of Civil Appeals erred in affirming the trial court’s order denying N.J.J. worker’s compensation benefits based on the special-assault statute. Accordingly, I respectfully dissent.

. Because the trial court expressly based its findings of fact and conclusions of law both on evidence indicating that D.S. was present and on evidence indicating that D.S. was not present, I cannot conclude that the trial court found that D.S. was not present during the attack. However, even if the trial court had so found, such a finding would not affect my analysis or conclusion. Although D.S.'s presence or absence during the attack is relevant to whether N.J.J.'s attack was motivated by reasons personal to her attackers, it is not determinative as to whether, by placing N.J.J. in the parking lot in the early morning hours, N.J.J.'s job "as a restaurant manager” subjected N.J.J. to a hazard of assault she would not be exposed to equally apart from her employment. See Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 44, 8 So.2d 519, 520 (1942).

. Now codified as § 25-5-1(9), Ala.Code 1975.

. I note, however, unlike the usual rules of tort liability, the Workers’ Compensation Act does not require that injuries must be foreseeable to be compensable. See Moore § 10:4.

. As Justice Smith notes, at the trial in this case the entire police report of the investigation into the assault was admitted into the record without objection.

. Moreover, I see no reason to interpret the workers’ compensation statute so as to punish an employee for arriving at work early to perform her duties for the employer's benefit where there is no evidence that early arrival is prohibited. Ex parte Ruggs, 10 So.3d 7, 12 (Ala.2008) (“ ' ’‘[C]ourts must liberally construe the workers’ compensation law 'to effectuate its beneficent purposes,' although such a construction must be one that the language of the statute 'fairly and reasonably supports.' " ' ").

. I note, however, that the record contains absolutely no evidence indicating why the attackers called N.J.J. a “nigger-lover.” If D.S. was present during the attack, her only acquaintance with the attackers came from a brief interaction through her employment that had nothing to do with her personal life. If, as Burger King argues, D.S. was not present during the attack, then the record shows that N.J.J.'s attackers were entirely strangers to her. In either case (and especially if D.S. was not present), there is not substantial evidence from which to conclude that the attackers could have known N.J.J. was married to an African-American or how she treated African-Americans apart from her employment.